UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**LORI ANN MORIN,**

       **Plaintiff,**               **CIVIL ACTION NO. 10-13040**

       vs.                           **DISTRICT JUDGE SEAN F. COX**

**COMMISSIONER OF**           **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

       **Defendant.**
_____/

**REPORT AND RECOMMENDATION**

**I.**    **RECOMMENDATION:** This Court recommends that Defendant's Motion for Summary Judgment (docket no. 14) be GRANTED, Plaintiff's Motion for Summary Judgment (docket no. 13) be DENIED, and Plaintiff's complaint be dismissed.

**II.**    **PROCEDURAL BACKGROUND**

Plaintiff filed applications for a period of disability, disability insurance benefits, and supplemental security income alleging disability beginning January 19, 2006. (TR 123-32). The applications were denied and Plaintiff appeared with counsel for a *de novo* hearing before Administrative Law Judge (ALJ) Patricia S. McKay, who determined that Plaintiff was not disabled in a decision dated November 3, 2009. (TR 9-19). The Appeals Council declined to review the ALJ's decision and Plaintiff commenced the instant action for judicial review. (TR 1-3). The parties filed Motions for Summary Judgment and the issue for review is whether the Defendant's denial of benefits was supported by substantial evidence on the record.

**III.**    **PLAINTIFF'S TESTIMONY, THIRD-PARTY FUNCTION REPORT, MEDICAL EVIDENCE AND VOCATIONAL EXPERT TESTIMONY**

A.     **Plaintiff's Testimony**

Plaintiff was fifty-one years old at the time of the administrative hearing. (TR 26). She completed high school through a special education program and received some vocational training in school. (TR 27-28, 210). Plaintiff was employed as a secretary with Tacom from 1979 through 1995 and obtained that job through the vocational training program. (TR 27). She spent one-and-a-half years delivering flowers after she lost her job with Tacom due to downsizing. (TR 29). Plaintiff worked for T.J. Maxx for approximately nine to eleven years operating a cash register and unloading trucks. (TR 16, 29, 157). She received one to two weeks of initial job training at T.J. Maxx from a Goodwill job coach. (TR 42, 48). Plaintiff testified that she was fired from T.J. Maxx because of excessive sick leave due to colds and upper respiratory infections. (TR 29-30, 37).

Plaintiff testified that she lives alone. (TR 26). She takes care of her cat, drives a car every day, cooks simple meals, dresses herself, cares for her personal hygiene, shops for groceries, and washes laundry. (TR 31-36). She provides daily care for a wheelchair bound woman who is disabled by multiple sclerosis. (TR 32-34). Plaintiff has a computer and uses email. (TR 35-36). She socializes with friends several times a week and has a regular "girls night out" with her cousins and aunts. (TR 36). Plaintiff attends church regularly, enjoys watching television, and reports that she has difficulty following written instructions. (TR 36-37, 46).

B.     **Third-Party Function Report**

Plaintiff's sister completed an Adult Third-Party Function Report on June 30, 2007. (TR 171-78). The sister reported that Plaintiff is able to care for her own basic needs, shop, and make simple meals. She stated that Plaintiff provided companionship to their elderly mother and transported their mother to weekly doctor appointments. (TR 172). The sister reported that Plaintiff

could shop for their mother if given the original packaging and name of the store where the item could be purchased. (TR 174). She noted that Plaintiff has poor personal hygiene, gets easily confused when following written instructions, and gets angry when confronted with issues. (TR 173, 176).

**C.     Medical Record**

In May 1976, when she was eighteen years old, Plaintiff was evaluated by Coy Sims, school psychologist. (TR 144-46). Sims noted that Plaintiff's performance rate was average to slow, she had a moderate amount of speech, and extreme difficulty in shifting from one idea to another. The results of Plaintiff's Wechsler Adult Intelligence Scale (WAIS) showed that Plaintiff obtained a verbal IQ score of 75, a performance IQ of 92, and a full scale IQ score of 81. A Wide Range Achievement Test (WRAT) showed that Plaintiff scored at the third grade level in reading and arithmetic and at the fifth grade level in spelling. Sims considered the assessment of David Wechsler, the developer of the WAIS test, that WAIS evaluations of young adults tend to score ten points higher than should be anticipated, and opined that Plaintiff was functioning at the upper limits of the range of subjects usually classified as educable mentally impaired.

When Plaintiff was twenty-two years old she was evaluated by Dr. John A. George, Ph.D. to determine her capacity to sustain employment. (TR 210-16). Dr. George observed that Plaintiff was neat, clean, pleasant, and willing to try. He observed that Plaintiff processed language and problems slowly, but if given enough time did well and delighted in her success. Dr. George administered a WAIS test and noted that Plaintiff had a verbal IQ of 78, a performance IQ of 89, and a full scale IQ of 81. He concluded that Plaintiff had an overall intellectual functioning within the borderline dull-normal range, a verbal ability in the high borderline range, and concrete intelligence

3

that was dull-low average. Dr. George observed that Plaintiff was strong in the area of concrete performance and opined that Plaintiff could perform relatively uncomplicated concrete tasks at a low average level. He noted that Plaintiff scored in the fourth grade level in spelling and reading and the fifth grade level in arithmetic, which was suitable for adult function on relatively uncomplicated, routine jobs as well as functioning at a very modest level in society.

Dr. George assessed Plaintiff's mental age at thirteen years and her social maturity at sixteen years. He opined that Plaintiff was capable of living independently and having her own family. Dr. George observed that Plaintiff had been diagnosed with minor neurological deficits resulting in learning disability with slight dysphasia and dyspraxia. He concluded that Plaintiff had organic brain damage due to paranatal anoxia resulting in learning disability, dysphasia, and dyspraxia, and found that Plaintiff was able to perform remunerative work, care for herself, handle money, go to distant points alone, and continue schooling.

In 2006 and 2007 Plaintiff was diagnosed with depression and was put on Lexapro and Xanax. (TR 220, 225). In addition, she was diagnosed with morbid obesity, hypertension, hypothyroidism, hyperactive bladder, and allergic rhinitis. (TR 221, 231-33). In 2008 Plaintiff experienced anxiety attacks following the death of her mother and was given a prescription for Seroquel and Xanax. (TR 308, 310-11). A physical examination conducted by Dr. R. Patel on July 26, 2007 for the state Disability Determination Service (DDS) was unremarkable and reveals that Plaintiff had full range of motion of the spine, shoulder, elbow, hip, knee, ankle, wrist, hands, and fingers, with full grip strength, and no physical limitations. (TR 231-37). A Physical Residual Functional Capacity Assessment (RFC) performed by Dr. William Joh on behalf of the state DDS found that Plaintiff could lift and carry fifty pounds occasionally, twenty-five pounds frequently,

stand/walk/sit for six hours in an eight hour day, and engage in unlimited push/pull activities. (239-46). In addition, Plaintiff could stoop, kneel, or crawl occasionally, climb ramps and stairs occasionally, but never ladders, ropes, or scaffolds, and frequently balance or crouch. (TR 241). Dr. Joh concluded that Plaintiff had no manipulative, visual, communicative, or environmental limitations. (TR 242-43).

On August 7, 2007 Sheila C. Williams-White completed a Mental RFC and Psychiatric Review Technique on behalf of the state DDS. (TR 247-64). White diagnosed Plaintiff with a learning disability and bereavement following the death of her father. (TR 252, 254). White found that Plaintiff had moderate limitations in activities of daily living and in concentration, persistence, or pace, mild limitations in social functioning, and no episodes of decompensation. (TR 261). White opined that Plaintiff retained the ability to sustain an independent routine of simple activity, respond to simple demands, adapt to simple changes in routine, and perform simple work. (TR 249).

On November 20, 2008, three months after Plaintiff's mother died, Dr. Sung-Ran Cho performed a psychiatric evaluation of Plaintiff at the request of Plaintiff's attorney. (TR 265-70). Dr. Cho observed that Plaintiff's appearance was somewhat unkempt, she had slight body odor, and she had difficulties responding to his questions and explaining her problems. Plaintiff reported feeling depressed since her mother's death, and stated that she had panic attacks for the last one-and-a-half years occurring approximately once every one to two months. Plaintiff reported that she was frequently sick with respiratory infections and she was so afraid of being sick that she would call off her job and stay in bed.

Dr. Cho opined that Plaintiff had multiple disabilities that would markedly interfere with her ability to function at a job setting, including neurological deficits; limitations with intellectual and

5

emotional maturity; a lack of emotional relationships with others; comprehension problems; difficulties explaining her problems to others; depression; angry outbursts; and unusual fears over her health. Dr. Cho diagnosed Plaintiff with bipolar II disorder, depressed type; panic disorder; dementia associated with birth trauma; and borderline intellectual functioning. Dr. Cho found that Plaintiff had moderate limitations in her ability to understand and remember simple instructions, and marked deficits in carrying out simple instructions, carrying out and understanding detailed instructions, and making judgments on simple work-related decisions. In addition, he found that Plaintiff had marked limitations in interacting with others, responding appropriately to changes in work routine, and responding appropriately to work pressure. Dr. Cho opined that Plaintiff's unusual fears about minor physical ailments would cause her to miss work excessively.

**D.     Vocational Expert**

The Vocational Expert (VE) testified that Plaintiff's past office/clerical work at Tacom was light, low-end semiskilled work with a specific vocational preparation (SVP) code of 3. (TR 50). The VE testified that Plaintiff's past work in floral delivery and her past work as a retail sales clerk was light unskilled labor. (TR 50-51). In discussing Plaintiff's past work with T.J. Maxx, the VE noted that Plaintiff worked for T.J. Maxx for nine years and received job training for just the first two weeks. The VE testified that Plaintiff's position with T.J. Maxx was initially more of a sheltered position, but that Plaintiff was able to do the tasks assigned and learn them within the required time period. (TR 51).

The ALJ asked the VE to consider an individual with Plaintiff's age, education, and work experience who had the residual functional capacity to perform a full range of medium exertional work, with the following limitations: (1) occasional climbing of stairs and ramps, but never ladders,

6

ropes, or scaffolding, (2) occasional crouching, crawling, kneeling, stooping, or bending, (3) no more than occasional contact with the general public and coworkers, and (4) limited to simple work which does not require sustained concentration or focus. Additionally, the individual cannot perform work where the rate of pay is determined by the quantity produced, such as piece work. (TR 53).

The VE testified that while such an individual would not be able to perform Plaintiff's past relevant work as an office clerk/receptionist, delivery driver, or retail clerk, the hypothetical person could perform work as a packer, sorter, and assembler, comprising 10,200 jobs in the greater metropolitan Detroit area and 20,400 jobs in the state. (TR 55). If the individual was limited to light work with the same limitations, the individual could perform work as a packer, sorter, assembler, or janitor comprising 12,000 jobs in the greater metropolitan Detroit area and 24,000 jobs in the state. (TR 57-58). The VE testified that an individual's ability to maintain unskilled entry-level work would be inhibited if the individual missed more than two days of work per month due to illness. (TR 64).

## IV.     **ADMINISTRATIVE LAW JUDGE'S DETERMINATION**

The ALJ found that although Plaintiff had not engaged in substantial gainful activity since January 19, 2006, and suffers from the severe impairments of obesity, learning disability, hypothyroidism, and hypertension, she does not have an impairment or combination of impairments that meets or equals a listed impairment. (TR 11-15). The ALJ determined that Plaintiff retains the RFC to perform a range of light work. (TR 15-17). The ALJ further concluded that Plaintiff could not perform her past relevant work, but could perform a significant number of jobs in the national economy. (TR 17-19). Consequently, the ALJ concluded that Plaintiff is not disabled under the

Social Security Act.

## V. LAW AND ANALYSIS

### A. Standard Of Review

Pursuant to 42 U.S.C. § 405(g), the district court has jurisdiction to review the Commissioner's final decisions. Judicial review under this statute is limited to determining whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner's decision employed the proper legal standards. *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

### B. Framework for Social Security Disability Determinations

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

1. she was not presently engaged in substantial gainful employment; and
2. she suffered from a severe impairment; and
3. the impairment met or was medically equal to a "listed impairment;" or
4. she did not have the residual functional capacity to perform her past relevant

8

work.

20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f). If Plaintiff's impairments prevented her from doing her past relevant work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled. 20 C.F.R. §§ 404.1520(g), 416.920(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987) (citation omitted). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question if the question accurately portrays the plaintiff's physical and mental impairments. *Id.* (citations omitted).

**C.     Analysis**

**1.     Listing 12.05 Mental Retardation**

At step three of the five-step sequential analysis, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or equals one of the listed impairments. Plaintiff now argues that the ALJ failed to consider if the combination of Plaintiff's impairments equals Listing 12.05(C) for mental retardation.

Listing 12.05(C) provides:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements

>   in A, B, C, or D are satisfied.
>
>   ...
>
>   C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

In order to demonstrate mental retardation under Listing 12.05(C), Plaintiff must demonstrate that her impairment satisfies the diagnostic and severity criteria of that listing. More specifically, Plaintiff must demonstrate (1) subaverage intellectual functioning with deficits in adaptive functioning that initially manifested during the developmental period; (2) a valid verbal, performance, or full scale IQ of 60 through 70; and (3) a physical or mental impairment imposing an additional and significant work-related limitation of function. *West v. Comm'r*, 240 Fed. Appx. 692, 697-98 (6th Cir. 2007).

Plaintiff argues that she meets the criteria of Listing 12.05(C) because she achieved a verbal IQ score of 75 at eighteen years old and a verbal IQ score of 78 at twenty-two years old. She argues that her verbal IQ scores should be adjusted downward by ten points to reflect the opinion of David Wechsler, the developer of the WAIS test, that young adults score approximately ten points higher on WAIS evaluations than anticipated. Plaintiff contends that the ALJ failed to consider this ten point adjustment when addressing Listing 12.05(C). She contends that by applying a ten point downward adjustment, her IQ scores fall squarely within the required criteria of Listing 12.05(C).

Plaintiff does not cite any authority for the proposition that the ALJ should downwardly adjust a claimant's numerical IQ scores to account for a ten point error of measurement in the WAIS scores of young adults. At the same time, this apparent scoring deviation was considered during Plaintiff's evaluation. Indeed, the ALJ observed that the ten point variation was considered by Mr.

Sims when he evaluated Plaintiff's scores. At the point of evaluation Mr. Sims observed that even with a ten point adjustment Plaintiff's scores "placed her at the upper limits of the educable mentally impaired classification." (TR 13). Thus, the record shows that the ten point deviation was sufficiently accounted for by the evaluator.

Without addressing the diagnostic criteria of listing 12.05, Plaintiff has not demonstrated that she obtained IQ scores of 60 through 70 and met the required level of severity for this disorder. The ALJ's conclusion that Plaintiff does not have an impairment or combination of impairments that meets or equals a listed impairment is supported by substantial evidence.

**2.      Treatment of Dr. Sung-Ran Cho's Medical Opinion**

At step four of the five-step sequential analysis, the ALJ considered her assessment of Plaintiff's RFC and Plaintiff's past relevant work and found that Plaintiff retained the ability to perform a range of light work but could no longer perform her past relevant work. Plaintiff now argues that the ALJ ignored the medical findings of Dr. Sung-Ran Cho regarding Plaintiff's abilities to sustain employment in a competitive workplace.

Dr. Cho evaluated Plaintiff once at the request of Plaintiff's attorney and concluded that Plaintiff had (1) marked deficits in carrying out simple instructions, carrying out and understanding detailed instructions, making judgments on simple work-related decisions, interacting with others, responding appropriately to changes in work routine, and responding appropriately to work pressure, and (2) moderate deficits in understanding simple instructions. Dr. Cho diagnosed Plaintiff with bipolar II disorder, depressed type; panic disorder; dementia associated with birth trauma; and borderline intellectual functioning. He further opined that Plaintiff had multiple disabilities which would markedly interfere with her ability to function at a job setting, along with unusual fears about

minor physical ailments that would cause her to miss her work excessively.

The ALJ found that Dr. Cho's opinion was not persuasive because it was inconsistent with the medical record as a whole. Specifically, the ALJ observed that Dr. Cho diagnosed Plaintiff with marked limitations in functioning despite the fact that Plaintiff exhibited a relatively high level of functioning in the face of her impairments. Additionally, the ALJ observed that Dr. Cho diagnosed Plaintiff with significant psychiatric issues not previously of record based primarily on Plaintiff's subjective complaints, when the treatment records showed Plaintiff was diagnosed with learning disability, did not identify the diagnoses listed by Dr. Cho, and showed that Plaintiff did not require consistent mental health treatment.

The ALJ observed that the statement that Plaintiff was not able to hold down a job because of excessive illness-related absences was contradicted by Plaintiff's sparse treatment records which did not show that she was treated as frequently as she alleged, and undercut by evidence that Plaintiff used illness as a means to avoid responsibility. Additionally, the ALJ observed that Plaintiff's claims that she could not hold down a job because of illness-related absences was not consistent with the evidence that Plaintiff worked for T.J. Maxx for approximately nine to eleven years and was reportedly let go not merely due to absences, but also because her cash drawer was short of money. The ALJ observed that Dr. Cho's assessment that Plaintiff was confused and had difficulty expressing herself was not consistent with Plaintiff's hearing testimony in which Plaintiff responded to questions precisely and without difficulty. Finally, the ALJ noted that Plaintiff's report of worsening depression and persistent anxiety attacks were not indicated by Plaintiff's sparse treatment records and lack of consistent mental health treatment.

It is well-settled that the ultimate issue of disability is reserved to the Commissioner. 20

C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). The ALJ therefore was not bound by Dr. Cho's opinion that Plaintiff had multiple disabling conditions. Furthermore, the ALJ gave legitimate record supported reasons for discounting the opinion of Dr. Cho. Accordingly, the ALJ's decision to afford less weight to Dr. Cho's opinion is sufficiently explained and supported by substantial evidence.

**3.     Defendant's Step Five Disability Analysis**

At step five of the sequential analysis, the ALJ considered Plaintiff's RFC, age, education and past work experience and found based on the testimony of the VE that there were a significant number of jobs in the national economy that Plaintiff could perform. Plaintiff now argues that the ALJ erred at this step of the analysis because she failed to properly consider that Plaintiff's past work was not competitive employment and failed to consider the VE's testimony that excessive absences would be work preclusive.

Plaintiff argues that her past work with TACOM and T.J. Maxx was sheltered employment. The record shows that Plaintiff secured her position with TACOM through a vocational training program, she earned $3.57 per hour when she started the position in 1979, and her job was initially considered to be compatible with her disability. While Plaintiff alleges that she received a reduced rate of pay at TACOM the record shows that she earned up to $9.99 per hour with no indication that her rate of pay was reduced. (TR 180, 183). Plaintiff worked for TACOM for fifteen years and she was let go from that position because of downsizing. The record shows that Plaintiff secured her position with T.J. Maxx with the help of a job coach. Immediately after she was hired she received two weeks of job training and she received additional training from a T.J. Maxx employee whenever her job duties changed. Plaintiff worked for T.J. Maxx for up to eleven years. The VE testified that Plaintiff's position with T.J. Maxx was initially more of a sheltered position, but that Plaintiff was

13

able to do the tasks assigned and learn them within the required time period. (TR 51).

The ALJ considered the evidence and concluded that Plaintiff's work with TACOM was full-time competitive employment. (TR 16). The ALJ further found that Plaintiff only required a job coach at T.J. Maxx for the first two weeks, then continued her employment with T.J. Maxx for nearly eleven years. The ALJ found that Plaintiff clearly adjusted to her past work and was capable of continuing to perform simple work-related activities on a routine basis. (TR 16). With regard to whether the ALJ considered whether Plaintiff's excessive illness-related absences would be work preclusive, the ALJ concluded that the record did not show that Plaintiff was treated for frequent illnesses or that frequent absences inhibited her ability to maintain employment.

The record shows that the ALJ considered the evidence before her and crafted hypothetical questions that accurately portrayed Plaintiff's limitations. The ALJ then posed valid hypothetical questions to the VE and found based on substantial evidence in the record that there are a significant number of available jobs in the economy that Plaintiff can perform. The Court should find that the ALJ's decision to deny Plaintiff's claim for benefits is supported by substantial evidence. Accordingly, Defendant's Motion for Summary Judgment should be granted and Plaintiff's Motion for Summary Judgment should be denied.

**REVIEW OF REPORT AND RECOMMENDATION**:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections that raise some issues but

fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: January 26, 2012        s/ Mona K. Majzoub
                               MONA K. MAJZOUB
                               UNITED STATES MAGISTRATE JUDGE


## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: January 26, 2012        s/ Lisa C. Bartlett
                               Case Manager